IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LLOYD J. REYNOLDS,

      Plaintiff,

v.                                              CIV 10-0685 KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

# MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's motion to reverse or remand the Commissioner's decision denying Social Security benefits.  *See Doc. 16*.  Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  *See Docs. 4, 7*.  Having carefully and meticulously considered the record and the parties' arguments, I find that substantial evidence supports the decision of the Administrative Law Judge, and Plaintiff's Motion *(Doc. 16)* is therefore denied.

## I.    Background

Lloyd J. Reynolds is a 46-year-old Native American who first applied for

Supplemental Security Income ("SSI") on August 12, 2005 and Disability

Insurance Benefits ("DIB") on August 16, 2005.  *See Administrative Record*

*("R.")* at 41-42.  Noting a primary diagnosis of Diabetes Mellitus and a secondary

diagnosis of "chronic muscle strain," the Social Security Administration

("Administration") determined that Mr. Reynolds was not disabled and denied

benefits on November 7, 2005.  *See id.*  Mr. Reynolds reapplied for DIB and SSI

on April 4, 2006 and April 19, 2006, respectively.  *See R.* at 38-39.

Simultaneously, Mr. Reynolds also sought reconsideration of the August 2005

denials.  *See R.* at 32, 35.  The diagnoses identified on the reapplications and

requested reconsiderations are "myofascial pain" and "mood disorder."  *See R.* At

32, 35, 38-39.  Again, the Administration found that Mr. Reynolds was not

disabled and denied benefits.  *See id.*

The Administrative Law Judge ("ALJ") determined that although Mr.

Reynolds' impairments of myofascial pain, depression, diabetes, and a history of

alcohol abuse were severe[1], they did not meet or equal one of the listed

---

[1] "A claim may be denied at step two only if the evidence shows that the individual's
impairments, when considered in combination, are not *medically* severe, i.e., do not have more
than a minimal effect on the person's physical or mental ability(ies) to perform basic work
activities.  If such a finding is not clearly established *by medical evidence*, however, adjudication
must continue through the sequential evaluation."  SSR 85-28, 1985 WL 56856 at *3 (1985).
Where the medical evidence—as distinguished from the claimant's own subjective opinions, for
example—is not clear in terms of the effect of an impairment on the claimant's ability to work,
"the sequential evaluation process should not end with the not severe evaluation step."  *Id.* at *4.

impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). *See R.*
at 14-15. The ALJ further determined that Mr. Reynolds had the residual
functional capacity ("RFC") to perform unskilled light work. *See R.* at 15-19.
Without obtaining testimony from the vocational expert who was present at the
hearing, the ALJ determined that Plaintiff has the RFC to perform unskilled light
work. *See R.* at 19. Thus, the ALJ denied benefits, finding Mr. Reynolds not
disabled at Step 5 of the Sequential Evaluation Process.

The Appeals Council declined review on May 17, 2010. *See R.* at 2-4. As
such, the ALJ's decision is final. *See Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th
Cir. 2011). Plaintiff's motion to reverse or remand argues that the ALJ erred in
finding that he "could perform other work in the national economy without
obtaining vocational expert testimony." *Doc. 17* at 6.

### Diabetes

Mr. Reynolds was first diagnosed with Type II Diabetes Mellitus in January
2004. *See R.* at 498, 455-466. Initially, with the help of an oral medication,
Metformin, Mr. Reynolds maintained "good" and even "excellent" control of his
diabetes for the better part of two years, despite a lack of consistent medical care
and his admitted failures to take care of himself. For instance, in May 2004, Mr.
Reynolds visited Isleta Health Center and reported he "hasn't been checking BS's

[blood sugars] lately.  Dealing [with] a lot of stress & not taking care of himself."
*R.* at 490.  Thereafter, Mr. Reynolds failed to keep follow-up appointments on
June 2, 2004, and June 22, 2004, *see R.* at 487-488, and did not see a doctor again
until January 7, 2005, when he left the Clinic before being seen, *see R.* at 287-288.
Mr. Reynolds' physician noted on January 21, 2005 that his diabetes was in "good
control" with the help of his medication, Metformin.  *R.* at 480.  Mr. Reynolds
maintained "excellent control" on Metformin through October 12, 2005.  *See R.* at
270.

On January 23, 2006, however, Mr. Reynolds stopped taking his medication
for about two months, leading his physician to note that his diabetes was
"uncontrolled."  *See R.* at 267.  At Mr. Reynolds' request, his physician
discontinued Metformin in favor of Glucotrol.  *See id.*  Thereafter, Mr. Reynolds'
diabetes remained out of control.

On March 1, 2006, Mr. Reynolds' physician noted his diabetes was still not
controlled but "improving."  *See R.* at 259.  At this appointment, Mr. Reynolds
reported having misplaced his blood sugar monitor.  *See id.*  On May 10, 2006,
Mr. Reynolds again reported he had not been checking his blood sugars and a lost
monitor; his diabetes was "uncontrolled."  *See R.* at 254.  On July 21, 2006, Mr.
Reynolds left his appointment early and did not return as promised.  *See R.* at 232.

4

At his next doctor visit, on October 6, 2006, Mr. Reynolds requested a new blood sugar monitor and complained of feeling really tired with no energy and no appetite, blurred vision, inability to concentrate and shakiness. *See R.* at 228. A random blood sugar test performed during that visit came back at 342 mg/dL; normal values are 70-125 mg/dL. *See id*; http://diabetes.webmd.com/blood-glucose?page=3. The notes report that Mr. Reynolds cried during the October 6, 2006 appointment, and that he was "concerned about present symptoms" and said wanted "to bring BS levels down and would be willing to go to counseling." *See id.* But he then cancelled or failed to keep follow-up appointments and was not seen in the Isleta Health Center again until June 2007. *See R.* at 224, 223, 222 (granting refill of Glucotrol but requiring patient to return to the clinic 02/14/07), 221 (reporting patient called to cancel 02/14/07 appointment) , 219 (granting refill request for Glucotrol on 03/02/07 but requiring doctor visit "next week"); 214 (noting refill request on 06/06/07 and indicting RTC ("return to clinic") 07/25/07).

On June 22, 2007, Mr. Reynolds called Isleta Health Clinic to request an early refill of Glucotrol and reported he had been doubling his daily dose of Glucotrol"b/c sugar has been high." *See R.* at 211. Isleta Health Clinic granted Mr. Reynolds a new prescription for Glucotrol twice daily for two months, and required him to make an appointment prior to obtaining the medication. *See id.*

The same day, he met with Kristyn Yepa, R.N. for education regarding blood-glucose monitoring.  *See R.* at 212.  Although Mr. Reynolds was required to return to the clinic in one week, yet again he failed to do so.  *See R.* at 210 (noting attempts to reach Mr. Reynolds).  He ultimately returned to meet with Nurse Yepa on July 13, 2007, when he stated, "I want to start controlling my sugar.  I learned a lot & I don't want to feel like this."  *R.* at 209.  Nonetheless, Mr. Reynolds was a no-show for his subsequent diabetes follow-up on August 15, 2007.  *See R.* at 205.

On October 4, 2007, Mr. Reynolds' wife advised one of his care providers that Mr. Reynolds was "not consistent with his diabetes care."  *R.* at 188.  On October 15, 2007, when Mr. Reynolds next requested a refill for Glucotrol, he was granted only an 8-day supply until he could be seen by a physician.  *See R.* at 204.  On October 23, 2007, Mr. Reynolds' physician conducted a diabetes management appointment, noting that his last appointment was a year ago and that his diabetes remained "uncontrolled."  *See R.* at 159.  Mr. Reynolds' diabetes remained uncontrolled as of November 2, 2007 and February 6, 2008, his most recent doctor visits in the record.  *See R.* at 156 & 153-54.

## Pain

In the midst of his problems with diabetes, Mr. Reynolds also began reporting "intermittent back and neck pain" that he had experienced "for years."

*See R.* at 480.  On January 21, 2005, his physician at Isleta Health Center diagnosed "musculoskeletal pain - neck" and prescribed Tylenol 3.  *See id.*  On February 17, 2005, Mr. Reynolds returned to the Isleta Health Center reporting that he had injured his back while unloading trash that morning.  *See R.* at 479. His physician diagnosed "LBP (lower back pain) - myofascial" and prescribed Flexeril, 10mg "for spasms."  *See id.*  On May 16, 2005, Mr. Reynolds again reported back pain, complaining of "recurrent left *upper* back pain" over the course of four years.  *See R.* at 472 (emphasis added).  He specifically requested a prescription for Soma and indicated that "morphine [is] no help - (street drug)." *See id.*  Riley Nelson, M.D. assessed "back pain" and prescribed Diazepam, 5mg. *See id.*  Dr. Nelson noted "myofascial; declines PT referral" and indicated that he advised Mr. Reynolds to apply heat, stretching, and massage to the affected area. *See id.*  Dr. Nelson further advised Mr. Reynolds to return to the clinic if the pain worsened or "when he has time for PT."  *See id.*

On July 8, 2005, Mr. Reynolds again reported upper left back pain.  *See R.* at 468.  He indicated that "only Soma or 2 beers helps."  *Id.*  Daniel St. Arnold, M.D. diagnosed "chronic upper back pain, probable chronic muscle strain" and prescribed massage, heat, stretching, and Naproxen, 250mg, noting that he "discussed problems with Soma, addiction potential."  *Id.*  On July 21, 2005, Isleta

7

Health Center records indicate that Mr. Reynolds' Naproxen prescription was returned to stock because Mr. Reynolds had never picked it up. *See R.* at 273. On October 12, 2005, Mr. Reynolds continued to complain of back pain, "unable to work now, filing for disability." *See R.* at 270.

On June 12, 2006, Mr. Reynolds reported to the Albuquerque Indian Health Center complaining of systemic joint pain, worsening over the previous year and a half. *See R.* at 343-344. X-Rays of Mr. Reynolds' lumbar spine were "unremarkable" but showed a "slight asymmetry of SI joints with sclerosis surrounding the left SI joint," which "could be due to early involvement of SI joints with inflammatory disease such as Reiters syndrome." *See. R.* at 236. On July 10, 2006, Mr. Reynolds was scheduled for follow-up in the Albuquerque IHS Rheumatology Clinic, but he left without being seen by a provider. *See R.* at 341-342. On July 21, 2006, Mr. Reynolds came to the Isleta Health Center complaining of numbness and tingling in his left arm. *See R.* at 232. Although the physician recommended an EKG, Mr. Reynolds left to take his wife to a doctor appointment, indicating that he would return. *See id.* Mr. Reynolds' physician on July 21, 2006 noted "arm pain (myofascial v. DM neuropathy)." *Id.* There are no subsequent reports of back pain in the record, but there are reports of physical soreness and joint pains and indications that these are related to Mr. Reynolds'

8

diabetes.  *See R.* at 189 (complaining of sleepiness and physical soreness); 190
(complaining of joint pain in his back, wrist, neck, and elbows).

## Mental Health

In addition to his diabetes and back pain, Mr. Reynolds' medical records
also contain information regarding possible mental health problems.  He first
complained of depression on September 5, 2003, prior to his diabetes diagnosis.
*See R.* at 500.  His physician noted that Mr. Reynolds "may have some element of
depression."  *Id.*  There was no prescribed treatment, however, and Mr. Reynolds
did not complain of depression again until April 5, 2006, when his physician noted
possible depression after Mr. Reynolds reported he was frustrated about his
diabetes diagnosis because "there's so many things he can't do."  *See R.* at 257.
Two days later, on April 7, 2006, Mr. Reynolds' physician, Elizabeth Cumby,
M.D., wrote a letter "To Whom It May Concern," stating that

> Lloyd Reynolds is currently under my care for uncontrolled diabetes and
> depression.  Since his blood sugar has not come under control yet, he is
> suffering from fatigue, insomnia and body aches.  He cannot work at
> present.  Please assist him in obtaining financial assistance.

*R.* at 317.  Dr. Cumby initiated Zoloft, 100 mg #30 on May 10, 2006.  *See R.* at
254.  Mr. Reynolds never picked up his prescription for Zoloft, however, and
Isleta Health Center noted the medications were returned to stock on June 7, 2006.
*See R.* at 237.

9

On May 24, 2006, secondary to his application for benefits, Mr. Reynolds underwent a disability determination examination by Louis Wynne, Ph.D., who noted that Mr Reynolds

> was able to copy a pair of intersecting pentagons, but his ability to remember and carry out a written three-part set of directions was marginal. His fund of information was less than average, and his ability to abstract was limited. He could not count backwards from 100 either by threes or by sevens; but he could remember a set of digits forwards to seven, and backwards to six. His judgment, based on his answers to Wechsler Adult Intelligence Scale-type comprehension questions, was limited, and he could not spell a common five-letter word backwards. His short-term memory for both items and words was unimpaired and he could perform operations in simple mental arithmetic. I estimate his intelligence as average, and his ability to present a plausible, detailed, and comprehensive personal history as unimpaired.
>
> *   *   *
>
> Difficulty understanding basic written instructions, but his concentration and ability to persist at simple work tasks is unimpaired. He could interact well with the general public and his coworkers, and he would have little difficulty getting along with supervisors and adapting to changes in the workplace. He could recognize hazards and he could manage his own benefit payments.

*R.* at 367-68. Overall, Dr. Wynne diagnosed Mr. Reynolds with "mood disorder/depression due to chronic illness" and rated his Global Assessment of Functioning ("GAF") at 58. *R.* at 368. According to the DSM-IV-TR, a GAF of 51-60 indicates "**moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." AM.

10

PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL

DISORDERS at 34 (4th ed., text revision, 2000).

On June 5, 2006, J. LeRoy Gabaldon, Ph.D., completed a Psychiatric

Review of Mr. Reynolds, noting that his impairment—characterized as an

unspecified "mood disorder"—was not severe.  *See R.* at 351 & 354.  Dr.

Gabaldon rated Mr. Reynold's functional limitations upon activities of daily

living; maintaining social functioning; and maintaining concentration, persistence,

or pace all as "mild."  *See R.* at 361.  Dr. Gabaldon stated, "Mr. Reynolds is

cognitively intact without evidence of thought disorder or ongoing substance

abuse."  *See. R.* at 363.

Mr. Reynolds began regular counseling sessions pursuant to conditions

imposed by an Isleta Tribal Judge after he was arrested for DWI.  *See R.* at 168-69.

At his first counseling session, Mr. Reynolds denied any need for counseling for

substance abuse and reported trouble falling asleep due to excessive worry, not

being able to stay on task because of forgetfulness and/or distractions, "hating it

when people say 'oh' instead of 'zero' when referring to the number zero," and

hating bells "i.e., convenient store, car, and others."  *See R.* at 170.  Therapist

Frazier Wilson, MSW, LCSW, LMSW, LADAC noted he would need to "r/o (rule

out) Adult ADD, and Anxiety Disorder based on client's comments during this

11

session." *Id.*

On November 5, 2007, after about four months of counseling Mr. Reynolds, Therapist Wilson completed a Medical Assessment. *See R.* at 199-202. He noted that Mr. Reynolds was suffering from bipolar syndrome, resulting in *marked* restriction of activities of daily living and *marked* difficulties in maintaining social functioning. *See R.* at 201 (emphasis added). Mr. Wilson also reported that Mr. Reynolds was experiencing an anxiety-related disorder, and indicated that there were medically documented findings of recurrent obsessions or compulsions which were a source of marked distress, resulting in *marked* restriction of activities of daily living and *marked* difficulties in maintaining concentration, persistence, or pace. *See R.* at 202 (emphasis added).

The record contains no evidence to support Mr. Wilson's opinion that Mr. Reynolds experienced "marked" restriction of his activities of daily living. In his original 2005 application for benefits, Mr. Reynolds stated that he had "no problem" with personal care items such as dressing himself, bathing, caring for his hair, shaving, feeding himself, or using the toilet. *See R.* at 95. There is no indication in the Record over the following two years to indicate that Mr. Reynolds lost his ability to care for himself in these regards. Mr. Wilson himself noted that Mr. Reynolds had an "appropriate appearance" at nearly each and every

12

counseling session over the course of four months of therapy sessions.  *See R.* at

170, 175, 176-77, 181, 183, 188, 189, 190, 191, 194, & 195.  *But see* 180 (noting a

"disheveled appearance" only on August 9, 2007).

Mr. Wilson's opinions that Mr. Reynolds suffers "marked" problems in the

general areas of maintaining social functioning and maintaining concentration,

persistence, and pace are also unsupported.  In fact, within the same Medical

Assessment, Mr. Wilson indicates only slight or moderate difficulties with

individual tasks under the umbrella of social functioning, despite having the

option to check boxes indicating "marked" difficulties.  *See R.* at 199.  Similarly,

with regard to his assessment of Mr. Reynolds' sustained concentration and

persistence, Mr. Wilson indicated slight or moderate difficulties, with only one

area in which Mr. Reynolds had "marked" problems.  *See R.* at 200 (noting

"marked" difficulty completing a normal workday and workweek without

interruptions from psychological based symptoms and to perform at a consistent

pace without unreasonable number and length of rest periods).

After visiting Therapist Wilson about three times, Mr. Reynolds saw

Psychiatrist Richard Smith, M.D.  *See R.* at 178.  On July 19, 2007, Dr. Smith

noted, "Mr. Reynolds does report he has been depressed and quickly adds that he

is extremely busy with his work as a security guard and many other jobs and

projects – fixing his car; caring for his alfalfa field." *Id.* Although Dr. Smith found Mr. Reynolds "guarded," he reported that Mr. Reynolds' "memory is good with history." *Id.* Dr. Smith's diagnosis was "mood disorder NOS (not otherwise specified)." *Id.* Dr. Smith gave no indication of any restrictions or limitations upon Mr. Reynolds' activities or ability to work. *See id.*

Just three days after Mr. Wilson completed his assessment, Mr. Reynolds saw Dr. Smith for the second time on November 8, 2007. *See R.* at 196. Dr. Smith indicated that Mr. Reynolds "remains very depressed" and prescribed Lexapro, 10 mg. *Id.* There is no indication from Dr. Smith that Mr. Reynolds might have bipolar disorder or an anxiety disorder. *See id.* Likewise, Dr. Smith makes no mention of any limitations upon Mr. Reynolds' ability to work.

In addition to questions about the reliability of Mr. Reynolds' therapist, Mr. Wilson, questions also exist—and are even raised by Mr. Wilson—about Mr. Reynolds' credibility. On October 18, 2007, Mr. Reynolds reported short-term memory loss in that he could not remember if he had visited his daughter the day before. *See R.* at 190. Mr. Wilson expressed some uncertainty as to whether Mr. Reynolds was being truthful about his alleged memory problems, noting specifically that Mr. Reynolds was in the process of applying for social security benefits. *See id.* ("Client sx seem to be real; however, counselor is aware that

client wants to apply for SSI.").  Concerns about Mr. Reynolds' honesty as a

patient arose again on October 25, 2007, when Mr. Wilson noted his atypical

response to Eye Movement Desensitization and Reprocessing (EMDR) treatment.

> Client did not respond typically to the eye movements.  Counselor is not
> sure if client was honest with his responses.  Client presented as if he
> were in a trans [sic] like state when as[ked] to respond after each set of
> eye movements.  Counselor suspects that the client believe[s] this type
> of response is what counselor wanted.

 *See R.* at 191.  Along the same lines, Mr. Reynolds' problem with people using

the number zero and "oh" interchangeably—the initial problem that seemed to

give rise to Mr. Wilson's "diagnosis" of obsessive compulsive disorder

("OCD")—resolved abruptly on November 1, 2007, when Mr. Reynolds simply

reported that "'Os' do not bother him anymore."  *See R.* at 194.

## II.   Legal Standard

The Court reviews decisions denying social security disability benefits

"only to determine whether the correct legal standards were applied and whether

the factual findings are supported by substantial evidence in the record."  *Madrid*

*v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.  It requires more than a scintilla, but less than a preponderance."

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (internal quotation marks

omitted).  The ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotations and citations omitted).  The ALJ must consider all relevant medical evidence in making his or her findings and must "discuss the uncontroverted evidence he chooses not to rely upon as well as significantly probative evidence he rejects." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citation omitted).

A "disability" in this context requires both "an inability to engage in any substantial gainful activity" and "a physical or mental impairment, which provides reason for the inability." *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (internal quotation marks omitted).  The impairment must be a "'medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (quoting 42 U.S.C. § 423 (d)(1)(A)).  A claimant must establish that the onset of disability was before the date last insured.  *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).

The Court may neither reweigh the evidence nor substitute its judgment for

16

that of the agency.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." (internal citation and quotation omitted)).  The Court must meticulously examine the record, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan*, 399 F.3d at 1262.

## The Sequential Evaluation Process

"To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity."  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration employs a "five-step sequential evaluation process to determine disability."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).  "If at any step in the process the Secretary determines that the claimant is disabled or is not disabled, the evaluation ends."  *Thompson*, 987 F.2d at 1486.  *Accord Lax v. Astrue*, 489 F.3d at 1084 ("If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary.").

Steps One through Three require the claimant to show that: (1) he is not working at a substantial gainful activity; (2) he has a severe medically determinable physical or mental impairment or combination of impairments which significantly limit his ability to perform basic work activities; and (3) his impairment is equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and meets the duration requirement at 20 C.F.R. §§ 404.1520, 416.920.  *See Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011); *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

When a claimant does not meet any of "the Listings" in Part 404, Subpart P, Appendix 1, he is not entitled to a presumption of disability.  *See* 20 C.F.R. § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").  The Administration must therefore determine the claimant's Residual Functional Capacity ("RFC").  *See* 20 C.F.R. § 404.1520(e) ("If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record, as explained in § 404.1545.").

At Step Four, the Administration assesses whether the claimant's RFC

18

permits him to perform his past relevant work. *See* 20 C.F.R. §

404.1520(a)(4)(iv). Where the claimant can still perform his past relevant work,

he is not disabled. *See id.* In other words, Step Four "requires the claimant to

show that the impairment or combination of impairments prevents him from

performing his past work." *Wilson*, 602 F.3d at 1139 (quoting *Lax v. Astrue*, 489

F.3d at 1084).

If the claimant cannot perform his past relevant work, "the burden of proof

shifts to the Commissioner at [S]tep [F]ive to show that the claimant retains

sufficient RFC [residual functional capacity] to perform work in the national

economy, given [his] age, education, and work experience." *Id.* (quoting *Lax*, 489

F.3d at 1084). Rather than rely on individual vocational experts whose opinions

might be inconsistent, the Administration now looks to medical-vocational

guidelines which identify whether jobs exist in the national economy according to

a matrix of the relevant factors—physical ability, age, education, and work

experience. *See Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983). "Where a

claimant's qualifications correspond to the job requirements identified by a rule,

the guidelines direct a conclusion as to whether work exists that the claimant

could perform. If such work exists, the claimant is not considered disabled." *Id.*

at 462.

However, if the claimant has nonexertional impairments that prevent him from performing a substantial majority of the jobs within a particular exertional category, the Grids may only be used as a framework, and expert vocational testimony is required.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

> [A]n ALJ may not rely conclusively on the grids unless he finds (1) that the claimant has no significant nonexertional impairment, (2) that the claimant can do a full range of work at some RFC level on a daily basis, and (3) that the claimant can perform most of the jobs in that RFC level.  Each of these findings must be supported by substantial evidence.

*Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

## II.  Analysis

The ALJ found at Step One of the Sequential Evaluation Process that Mr. Reynolds had not engaged in substantial gainful activity since June 8, 2005, the alleged date of disability.  *See R.* at 13.  At Step Two, the ALJ found Mr. Reynolds had four severe impairments: myofascial pain, depression, diabetes, and a history of alcohol use.  *See id.*  At Step Three, the ALJ concluded that none of these impairments, either individually or in combination, meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Mr. Reynolds does not challenge these findings.  Mr. Reynolds' motion focuses on

Step Five.  Because he suffers from both exertional and non-exertional impairments, he argues the ALJ erred in relying solely upon the Medical-Vocational Guidelines ("the Grids") to determine that Mr. Reynolds was disabled. *See Doc. 17*.

According to the ALJ, in spite of Mr. Reynolds impairments, he "has the residual functional capacity to perform light work."  *R.* at 15.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).  Mr. Reynolds disputes his RFC assessment and contends the nonexertional functional limitations assessed by his treating therapist, Frazier Wilson, were not properly considered.  *See Doc. 17* at 7-8.

## A.   Mr. Reynolds' Therapist Is Not an Acceptable Medical Source and His Opinions Are Not Consistent with the Record as a Whole.

To establish a medically determinable impairment, the Administration requires "evidence from acceptable medical sources," including: (1) licensed physicians (medical or osteopathic doctors); (2) licensed or certified psychologists; (3) licensed optometrists, for purposes of establishing visual disorders only; (4) licensed podiatrists, for purposes of establishing impairments of the foot or foot and ankle only; and (5) qualified speech-language pathologists,

for purposes of establishing speech or language impairments only.  *See* 20 C.F.R.

§ 4043.1513(a).  Those who are not acceptable medical sources cannot be

considered treating sources.  *See, e.g., Martinez v. Astrue*, 2011 WL 1549517 at *7

(Apr. 26, 2011) (finding that ALJ "made a fundamental error by applying the law

concerning treating sources to Mr. Leitch's opinion, when Mr. Leitch cannot be

considered a treating source because he is not an acceptable medical source")

(citing 20 C.F.R. § 416.927(d))).  As such, the opinions of those who are not

acceptable medical sources cannot be given "controlling weight."  *See* 20 C.F.R. §

404.1527(d).

According to the medical records, Mr. Reynolds' therapist, Frazier Wilson,

has a master's degree in social work (MSW) and is a licensed clinical social

worker (LCSW), a licensed master social worker (LMSW), and a licensed alcohol

and drug abuse counselor (LADAC).  *See R.* at 170, 175-195.  None of these

credentials qualifies Mr. Wilson as an acceptable medical source under the

applicable regulations.  *See* 20 C.F.R. § 404.1513(a).

Instead, Mr. Wilson is considered an "other source," who can provide

evidence regarding the severity of an impairment and how it affects a claimant's

ability to work.  *See* 20 C.F.R. § 404.1513(d).  Mr. Wilson's opinions will

therefore be weighed according to the following factors: (1) existence of an

examining relationship; (2) whether a treatment relationship exists, including the length of the relationship, frequency of examination, and the nature and extent of the relationship; and (3) whether the opinion is supported by other evidence, such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) whether the source is a specialist in the field; and (6) other factors such as the source's familiarity with various programs and other information in the case record.  20 C.F.R. § 404.1513(d).

The ALJ determined in this case that while the medical records from acceptable medical sources "do establish the presence of diabetes and pain, the treatment records lack a medical source statement or an opinion regarding the claimant's capacity for work." *R.* at 17.  The ALJ considered Mr. Wilson's opinions about Mr. Reynolds' capacity for work, but he ultimately found that Mr. Wilson's assessments were "inconsistent with the objective evidence of record." *Id.*  Specifically, the ALJ relied upon the evidence provided by Mr. Reynolds' psychiatrist, Dr. Smith, and the consulting evaluation by Dr. Wynne.  *See id.* at 17-18.  During the same time frame that Mr. Wilson was counseling Mr. Reynolds, Dr. Smith noted that Mr. Reynolds was "busy" doing his security job, fixing his car, and taking care of his alfalfa fields.  *See R.* at 178.  Likewise, about a year earlier, Dr. Wynne indicated that Mr. Reynolds could concentrate sufficiently to

perform simple work tasks and get along properly with the general public,

coworkers, and supervisors.  *See R.* at 368.

In light of this evidence as well as the lack of any objective medical signs,

laboratory data, or even a supporting diagnosis of obsessive-compulsive disorder,

bipolar disorder, or any anxiety disorder by an acceptable medical source, I find

that substantial evidence supports the ALJ's conclusion that Mr. Wilson's

opinions should be accorded little weight.  Given the further fact that Mr. Wilson's

opinions are based in large part upon information provided by Mr. Reynolds and

given the legitimate concerns about Mr. Reynolds' credibility as discussed *infra*,

the ALJ's decision to give Mr. Wilson's opinions little weight was appropriate and

consistent with substantial evidence.

### B.   Dr. Cumby's Letter "To Whom It May Concern" Does Not Contradict the ALJ's Assessment of Mr. Reynolds' RFC.

As a medical doctor, Elizabeth Cumby, M.D. is an "acceptable medical

source."  *See* 20 C.F.R. § 4043.1513(a).  Moreover, Dr. Cumby appears to have

been Mr. Reynolds' treating physician at Isleta Health Center, at least for a time.

*See R.* at 493 (02/24/2004), 266-67 (01/23/06), 265 (01/24/06), 264 (01/27/06),

262 (01/31/06), 259 (03/01/06), 258 (03/22/06), 257 (04/05/06), 227 (10/31/06).

As such, her opinion that Mr. Reynolds was unable to work as of April 7, 2006

"due to uncontrolled diabetes and depression" may be entitled to controlling

weight if it is (1) well-supported by medically acceptable clinical and laboratory

diagnostic techniques and (2) not inconsistent with the other substantial evidence

in the record.  *See R.* at 317; 20 C.F.R. § 404.1527(d)(2).

The ALJ noted Dr. Cumby's "To Whom It May Concern" letter and found

that it indeed helps "establish the presence of diabetes and pain."  *R.* at 17.

However, the letter did not, in the ALJ's view, provide sufficient evidence of Mr.

Reynolds' capacity for work.  *See id.*  At the outset, I note that Dr. Cumby's letter

states that Mr. Reynolds' "blood sugar has not come under control *yet*" and

indicates only that "[h]e cannot work *at present*."  *See R.* at 317 (emphasis added).

This suggests that Dr. Cumby expected that Mr. Reynolds' condition would

improve such that he could work at some point in the future.

Indeed, substantial evidence in the subsequent record demonstrates that Mr.

Reynolds' impairments did not prevent him from working.  Most significantly, Mr.

Reynolds held a job as a part-time security guard beginning about a year after Dr.

Cumby's letter.  On June 26, 2007, a therapist at Isleta Behavioral Health Services

noted that Mr. Reynolds was "employed as a night security guard for past 3

months."  *See R.* at 168.  And on July 19, 2007, Mr. Reynolds advised his

psychiatrist, Dr. Smith, that he was "extremely busy with his work as a security

guard and many other jobs and projects – fixing his car, caring for his alfalfa

25

field." *R.* at 178.  Mr. Reynolds continued to be employed as a night security

guard, working five-and-a-half hours per shift, as of the date of his administrative

hearing on November 19, 2007.  *See R.* at 552.

Moreover, substantial evidence exists that Mr. Reynolds failed to comply

with Dr. Cumby's treatment plans, suggesting that his impairments were not

disabling as he claimed.  First, Mr. Reynolds did not comply with the diabetes

treatment prescribed by Dr. Cumby.  *See R.* at 254 (as of 05/10/06, about a month

after Dr. Cumby's letter, Mr. Reynolds reported he was not checking his blood

sugar levels and declined an appointment for diabetic education), 237 (on

06/07/06, Mr. Reynolds' Avandia prescription was returned to stock because he

had never picked it up), 233 (on 07/07/06, Mr. Reynolds cancelled his follow-up

appointment), 245-46 (on 07/10/2006, Mr. Reynolds left his appointment with

Albuquerque Indian Health Center's rheumatology clinic without being seen), 227

(on 10/31/2006, Mr. Reynolds reported he was not taking his medication as

directed, but instead on an as-needed basis).  Second, Mr. Reynolds apparently

rejected Dr. Cumby's prescribed treatment for depression.  *See R.* at 237 (noting

that Mr. Reynolds never picked up his prescription for Zoloft).

In light of this evidence, Dr. Cumby's April 2006 letter does not contradict

the ALJ's assessment of Mr. Reynolds' RFC.

**C.    The Record Supports the Conclusion that Mr. Reynolds' Statements About His Functional Abilities Are Not Credible.**

The ALJ also found that Mr. Reynolds' statements about his inability to function were not credible. *See R.* at 15-16.  Indeed, there is substantial evidence in the record to question Mr. Reynolds' truthfulness in his underlying reports about the intensity, persistence, and limiting effects of his impairments.  In Mr. Wilson's records alone, there are at least three instances when Mr. Wilson appears to be questioning Mr. Reynolds' truthfulness.

After more than three months of consistent therapy with Mr. Wilson and no prior indication of memory issues, Mr. Reynolds reported short-term memory problems for the first time on October 18, 2007.  *See R.* at 190.  However, just three months earlier, on July 19, 2007, Dr. Smith noted his "[m]emory good with history."  *R.* at 178.  Similarly, Dr. Wynne's prior evaluation was that Mr. Reynolds' short-term memory was "unimpaired."  *See R.* at 367.  There are no medical records indicating a head injury or other trauma which might explain the onset of memory problems.  Moreover, Mr. Wilson expressed uncertainty as to whether Mr. Reynolds was being truthful about his symptoms, specifically noting that Mr. Reynolds was in the process of applying for social security benefits.  *See R.* at 190 ("Client sx seem to be real; however, counselor is aware that client wants

27

to apply for SSI.").  And, as noted earlier, concerns about Mr. Reynolds' honesty

as a patient arose again one week later on October 25, 2007, when Mr. Wilson

noted his atypical response to EMDR therapy.  Mr. Wilson "suspected that client

believe[s] that this type of response is what counselor wanted."  *See R.* at 191.

Along the same lines, Mr. Reynolds' long-time and constant irritation with

people using the number "zero" and "oh" interchangeably initially gave rise to Mr.

Wilson's diagnosis of OCD.  But on November 1, 2007, Mr. Reynolds announced

that "'Os' do not bother him anymore."  *See R.* at 194.  Mr. Reynolds' explanation

for the sudden change?  A realization that a cashier who used "oh" instead of

"zero" "is someone's daughter, and that he would not want a stranger giving his

daughter a hard time should she ever be in a similar situation."  *See id.*  Mr.

Wilson noted a "very evident change in mood" and searched for an explanation as

to why Mr. Reynolds was unexpectedly not "as bothered by external stimuli that

triggers his obsessive behaviors."  *See R.* at 194.

Even more facts in Mr. Reynolds' medical records  suggest exaggeration.

On May 16, 2005, Mr. Reynolds complained of back pain, but declined a referral

to physical therapy.  *See R.* at 278.  On July 8, 2005, Mr. Reynolds again

complained of back pain and indicated that only the medication Soma would help.

*See R.* at 274.  When his physician prescribed Naproxen instead, after expressing

concern about addiction potential with Soma, Mr. Reynolds failed to pick up the

prescription.  *See R.* at 274, 273.  On July 10, 2006, after complaining of joint

pain, Mr. Reynolds received a referral to the Albuquerque Indian Health Center

Rheumatology Clinic but left without being seen.  *See R.* at 243-44, 245-46.  On

July 21, 2006, Mr. Reynolds complained of numbness and tingling in his left arm.

*See R.* at 232.  After his provider recommended an EKG, Mr. Reynolds again left

without being seen, indicating he would return later.  *See id.*  Mr. Reynolds did not

return.  Also, while Mr. Reynolds repeatedly lamented his out-of-control diabetes

and indicated that he took his diabetes medications consistently as recently as

October 6, 2006, he advised his physician on October 31, 2006 that he only took

his diabetes medications as needed because they made him feel uneasy.  *See R.* at

227-28.

### C.   Because Mr. Reynolds Lacks Acceptable Evidence of Limitation Resulting From His Impairments, The ALJ Did Not Err In Applying the Grids.

I find it was appropriate for the ALJ to rely primarily upon the opinions of

Drs. Smith, Wynne, and Gabaldon as to Mr. Reynolds' functional limitations, or

lack thereof.  The ALJ's conclusion that Mr. Reynolds is not significantly

impaired in terms of functional limitations is supported by substantial evidence.

Although Mr. Reynolds' therapist, Mr. Wilson, found that Mr. Reynolds had

greater limitations, the ALJ's decision to give Mr. Wilson's opinions less weight in light of Mr. Reynolds' credibility problems and the absence of any other acceptable evidence of limitation was appropriate and supported by substantial evidence.

Further, because Mr. Reynolds' lacks significant non-exertional impairment, application of the Grids is appropriate under *Thompson v. Sullivan*, where the Tenth Circuit held that the grids may be applied conclusively if the claimant "can do the full range of work at some RFC level on a daily basis." *See* 987 F.2d 1482, 1488 (10th Cir. 1993). Here, the ALJ's finding that Mr. Reynolds' "additional limitations have little or no effect on the occupational base of unskilled light work," *see R.* at 19, is supported by substantial evidence, as set forth herein. Given this specific finding, the ALJ's conclusive application of the Grids was appropriate. *See Channel v. Heckler*, 747 F.2d 577, 582 (10th Cir. 1984) ("Absent a specific finding, supported by substantial evidence, that despite his non-exertional impairments, Channel could perform a *full range* of sedentary work on a sustained basis, it was improper for the ALJ conclusively to apply the grids in determining that Channel was not disabled."). *See also Talbot v. Heckler*, 814 F.2d 1456, 1465 (10th Cir. 1987) (noting that "a nonexertional impairment can have a negligible effect on the range of jobs available").

**IT IS HEREBY ORDERED** that Plaintiff's motion is DENIED, and the

decision of the Commissioner is affirmed.  A final order will enter concurrently

herewith.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent